UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>           Plaintiff, )<br>)<br>v.                                     )<br>TERRY FIDDLER,           )<br>)<br>           Defendant. )<br>_____ ) | 2:10-cr-00052-RLH-LRL<br><br>MOTION TO DISMISS COUNT<br>ONE OF THE INDICTMENT (#18);<br>MOTION TO DISMISS COUNTS TWO<br>AND FOUR OF THE SUPERSEDING<br>INDICTMENT (#31) |

## REPORT & RECOMMENDATION

The defendant, Terry Fiddler, is charged with a violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a) (Count One), a misdemeanor; felony violations of the Lacey Act, 16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B) (Counts Two and Four, respectively); and a violation of the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668(a) (Count Three). The matters before the court are Fiddler's Motion to Dismiss Count One of the Indictment (#18) and Motion to Dismiss Counts Two and Four of the Superseding Indictment[1] (#31), to which the government filed Oppositions (#26) and (#32), respectively. Fiddler filed a consolidated Reply (#33), in which he addresses both Oppositions (#26, #31). Oral arguments were heard on January 20, 2011. Having considered the written submissions and the oral arguments of counsel, the court submits this Report and Recommendation.

The pending indictment is based on allegations that Fiddler sold to undercover agents for the United States Department of Fish and Wildlife ("USFWS") a war bonnet and a dance bustle that were

---

[1] On September 1, 2010, a federal grand jury returned a superseding indictment. The superseding indictment contains no new charges; it merely corrects the description of the crafts in Counts Two and Four.

made from feathers of protected birds.[2]  Fiddler met the undercover agents at a pow-wow.  The sales occurred in a Jack-in-the-Box parking lot located at Flamingo and Rainbow in Las Vegas.

**I. Motion to Dismiss Count One (#18)**

Fiddler is charged in Count One with violating the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703 and 707(a), by selling, offering for sale, bartering or offering to barter certain migratory bird feathers.  Fiddler contends that the charge based upon the MBTA must be dismissed because, pursuant to Supreme Court jurisprudence, the MBTA does not abrogate his tribal usufructory right to sell such feathers pursuant to the Sioux's Treaties of 1851 and 1868.  A usufructory right in the context of Native American treaties is the right "to make a modest living by hunting and gathering off the land."  *United States v. Bresette*, 761 F. Supp. 658, 660 (D. Minn. 1991).  The government argues that under Ninth Circuit precedent the court need not enter into an abrogation analysis, but even were the court to do so, Fiddler's conduct does not implicate any tribal right.  Therefore, according to the government, no usufructory right to sell the feathers is triggered.  At the hearing, the government further posited that issues of fact exist which would preclude the granting of the motion to dismiss pre-trial.

Proper analysis of the motion requires a clear understanding of general Indian law principles.[3] First, "federal laws generally applicable throughout the United States apply with equal force to Indians on reservations." *United States v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980), *superseded on other grounds by statute as recognized by Solis v. Matheson*, 563 F.3d 435, 437 (9th Cir. 2009).  Where a generally-applicable federal statute is silent on the issue of applicability to Indian tribes, the Ninth Circuit has recognized that the generally-applicable statute will not apply to the tribe or its members if, among other things, the application of the law to the tribe would abrogate rights guaranteed by Indian

---

[2] Counts One and Two pertain to sale of the dance bustle.  Counts Three and Four pertain to the sale of the war bonnet.

[3] The court's analysis of these principles is influenced by U.S. District Judge Shea's Order (#107) in *United States v. Hawk*, CR-09-2034-EFS, in the Eastern District of Washington.  There, Judge Shea analyzed nearly identical legal issues raised in a pre-trial motion to dismiss.  While that opinion is not published, in dismissing the MBTA charges against the defendants in *United States v. Wahchumwah*, 2009 WL 2604779 (E.D. Wash. August 23, 2009), Judge Shea specifically referred to his analysis in *Hawk*.

treaties. *Solis*, 563 F.3d at 430 (enumerating three situations in which "Congress must expressly apply a statute to Indians before we will hold that it reaches them") (citations omitted). Additionally, pursuant to Article VI of the United States Constitution, a federal treaty with an Indian tribe is the supreme law of the land. Thus, while Congress has the power to abrogate the provisions of an Indian treaty, it should do so only where "circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interests of the country and the Indians themselves, that it should be so." *United States v. Dion*, 476 U.S. 734, 738 (1986) (quoting *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566 (1903)).

To ensure that treaty rights are not "easily cast aside," a court analyzing the impact of federal legislation on treaty rights must determine whether Congress clearly and plainly intended to modify or abrogate an Indian treaty right. *Id.* at 739; *see also Menominee Tribe v. united States*, 391 U.S. 404 (1968); *Alaska Pac. Fisheries v. United States*, 248 U.S. 78 (1918); *Lumber Indus. Pension Fund v. Warm Springs Forest Prods.*, 939 F.2d 683 (9th Cir. 1991). Courts are thus extremely reluctant to find Congressional abrogation of treaty rights absent 1) explicit statutory language or 2) implicit intent in the legislative history and/or surrounding circumstances to abrogate a treaty right. *Washington v. Wash. Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979); *United States v. Fryberg*, 662 F.2d 1010, 1013 (9th Cir. 1983). In assessing whether Congress implicitly abrogated a treaty right, "[w]hat is essential is clear and convincing evidence that Congress considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve the conflict by abrogating the treaty." *Dion*, 476 U.S. at 739-40 (finding that by enacting the BGEPA Congress did intend to abrogate Native American treaty rights to hunt eagles).

The proper approach would be clear but for the Ninth Circuit's 1980 decision in *United States v. Fryberg* and the application of *Fryberg's* analysis in *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004). The *Fryberg* court determined that the BGEPA impliedly abrogated the defendant's treaty hunting right to take and kill bald eagles. In so holding, the court articulated the "conservation-necessity doctrine" to determine whether a conservation statute affects an Indian treaty right. *See*

*Fryberg*, 662 F.2d at 1015. The Ninth Circuit based its conservation-necessity doctrine on various Supreme Court cases, all of which involve *state* conservation statutes or regulations, and not Congressional treaty abrogation power.[4] These Supreme Court cases each analyzed whether a state, lacking the treaty abrogation power of Congress, appropriately exercised its police power to regulate Indian and non-Indian "in common" fishing and/or hunting off-reservation rights.

Six years after the *Fryberg* decision, the Supreme Court in *Dion* analyzed the same statute – the BGEPA – and held that Congress did intend to modify the treaty right to hunt eagles on reservation land. Notably, however, the Supreme Court employed an abrogation analysis in reaching its holding, without once referring to *Fryberg* or the state based conservation-necessity analysis. Nevertheless, eight years after *Dion*, the Ninth Circuit in *Anderson v. Evans* applied the conservation-necessity doctrine to a federal statute without recognizing or engaging in an abrogation analysis. In *Anderson*, a civil case brought by animal rights activists, the court held that the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361 *et seq.*, applied to the Makah tribe, explaining that the right to fish and hunt whales was a treaty right enjoyed "in common with all citizens of the United States." *Anderson*, 371 F.3d at 483.

The Ninth Circuit's decision in *Anderson* cannot be reconciled with the Supreme Court's decision in *Dion*. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 18.07. The statutes at issue in both cases were conservation statutes, and both provided permit processes. Yet the Supreme Court specified that the question in these cases is whether the statute manifests clear congressional intent to abrogate treaty-reserved rights, not whether the statute is a conservation measure. *Id.* While the *Anderson* court recognized in its footnote 22 that the Supreme Court did not discuss the conservation-necessity test in *Dion*, the court stated, "regardless of *Fryberg's* posture as an abrogation case, we conclude that the conservation necessity test articulated by *Fryberg* has not been undermined by later cases and is supported by the Supreme Court authorities above cited." 371 F.3d at 498 n.22. As noted by Judge

---

[4] *Puyallup Tribe v. Washington Department of Game*, 391 U.S. 392 (1968) ("*Puyallup I*"); *Washington Department of Game v. Puyallup Tribe* ("*Puyallup II*"), 414 U.S. 44 (1973); and *Antoine v. Washington*, 420 U.S. 194 (1974).

Shea, however, this conclusion was reached without analysis. Additionally, the Supreme Court cases alluded to in *Anderson* all involved state regulations and treaties with "in common" rights.

This court is persuaded that the Supreme Court's 1986 decision in *Dion* should control, not the Ninth Circuit's 1980 *Fryberg* decision, and that the *Anderson* holding specifically concerns "in common" treaty rights, which are not at stake here.[5] Accordingly, inasmuch as *Dion* is directly on point, and absent any explanation in *Anderson* for not applying precedential Congressional treaty abrogation analysis, this court will heed the admonition that treaties are not to be "easily cast aside," *Dion*, 476 U.S. at 739, and apply the Supreme Court's precedential abrogation analysis in this case.

With these principles in mind, the court turns to determining whether Fiddler's sale of the feathers is subject to the MBTA. The MBTA is an expansive statute, which prohibits in part offering for sale or bartering "any migratory bird, any part, nest or egg of any such bird, . . . ." 16 U.S.C. § 703(a); *Andrus v. Allard*, 444 U.S. 51, 60 (1979) ("On its face, the comprehensive statutory prohibition is naturally read as forbidding all transactions in all bird parts . . . ."). It's undisputed that the birds listed in Count One of the Indictment are migratory birds subject to the MBTA.

First, the court must determine whether a treaty right is at issue. The government argues that Fiddler's "conduct is not protected by his treaty rights and is subject to the regulation by Congress and the MBTA," Opp'n (#26) at 5, insofar as he "purchased the feathers from individuals who either gathered the feathers or hunted these endangered birds on a reservation." *Id.* at 2. At oral argument, the government asserted that the feathers had been gathered by members of the Crow Nation in Montana, where they were hunting on and off reservation land. It is the government's position that the motion cannot be decided as a matter of law, because there is a disputed question of material fact as to how and where the Crow men obtained the feathers.

Fiddler, an enrolled member of the Cheyenne River Sioux Tribe,[6] has standing to assert his

---

[5] "As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them unless such rights were relinquished by treaty or have been modified by Congress." *Dion*, 476 U.S. at 738.

[6] That Fiddler is an enrolled tribal member is not disputed.

5

1 usufructory rights provided for under the Treaties of 1851 and 1868. *See Bresette*, 761 F.Supp. at 660
2 ("It is not in dispute that both defendants are successors in interest to the Chippewa who entered into
3 these treaties and thus have standing to assert the treaty rights at issue."). In both his Motion (#18) and
4 Reply (#33), Fiddler asserts that he has the usufructory right to *sell* the feathers, which is precisely the
5 conduct he is charged with. Thus the issue is whether Fiddler enjoys a treaty right to sell the feathers.

6 Indian treaties are to be afforded a broad construction and to be interpreted as the Indians
7 understood them. *See Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 690;
8 *Bresette*, 761 F.Supp. at 662. The Sioux Treaty of 1868 reserved "the right to hunt on any lands north
9 of North Platte, and on the Republican Fork of the Smoky Hill River, so long as the buffalo may range
10 thereon in such numbers as justify the chase." Article 11 of the Sioux Treaty of 1868, attached as Exh.
11 C to Mot. (#18). While one purpose of the Treaty of 1868 was to promote farming, hunting was the
12 cornerstone of Sioux culture. *See* EDWARD LAZARUS, BLACK HILLS WHITE JUSTICE, THE SIOUX NATION
13 VERSUS THE UNITED STATES 1775 TO PRESENT 51-52 (HarperCollins 1991) ("Farming was more than just
14 foreign to the Sioux, it was repugnant.... Working a field lay beneath the dignity of a trained hunter....").
15 Explaining the benefits of the Treaty of 1868, Indian Bureau agents informed the Sioux that "[u]nder
16 this treaty you can roam and hunt while the game lasts; and when the game is gone you will have a
17 home and means of supporting yourselves and your children." *Id.* at 48. Sioux also engaged in
18 commerce with other tribes and non-tribe individuals by trading in and bartering furs and hides. *See id.*
19 at 50; *see also* GUY GIBBON, THE SIOUX: THE DAKOTA AND LAKOTA NATIONS 49 (Blackwell Publishers Ltd.
20 2003). Based on the Sioux's historical reliance on trading and bartering, and following the canons of
21 construction to interpret Indian treaties as the Indians would have understood them, the court concludes
22 that the usufructory right retained to the Sioux includes the right to trade by sale and barter.

23 The government's arguments regarding Fiddler's conduct being outside his treaty rights miss
24 the mark. The government has raised neither an argument nor a factual dispute pertinent to the *sale* of

the feathers.[7] In response to the court's inquiry as to what the government's evidence would be with regard to Fiddler's conduct, government counsel stated, "The government's evidence will be that these feathers were collected, or that birds were killed and the feathers were collected by a group of men who were not exercising their treaty rights. Who were on and off the reservation, who were killing birds on and off the reservation for commercial sale." The government's briefing similarly focuses on whether the feathers were gathered by others off reservation. The government has not, however, explained how someone else's earlier taking of the birds, possibly in violation of the MBTA, is imputed to Fiddler. Fiddler is charged with selling or bartering the feathers, not with taking them. He is not alleged under this count to have known the circumstances surrounding the gathering of the feathers, nor does the text of either §§ 703 or 707(a) of the MBTA refer to such an element. Furthermore, that Fiddler did not himself gather the feathers does not automatically bring his sale of the feathers outside his usufructory right to sell them. *See Bresette*, 761 F. Supp. at 659 (finding usufructory right to sell dream catchers made of migratory bird feathers, where defendant did not himself gather the feathers, but obtained them from other tribe members who had gathered the parts "on or near" the reservation).[8]

Because the court finds that Fiddler's purported sale of the feathers was within his usufructory rights, the court must now determine whether Congress intended to abrogate that right when passing the MBTA. The court concludes that the statute does not contain any indication that Congress intended the MBTA to abrogate Indian treaty rights. First, the statute contains no express indication that Congress considered Indian treaty rights and chose to abrogate them. While the MBTA does make reference to Native Alaskans, specifically allowing "indigenous inhabitants of the State of Alaska to take and collect migratory birds for food and clothing," 16 U.S.C. §§ 704, 712, this is irrelevant for the purposes of treaty rights because Native Alaskans do not *have* treaty rights. *Bresette*, 761 F.Supp. at

---

[7] The government did not, for example, argue that the location of the sale or to whom the feathers were sold impacted the treaty right to sell the feathers.

[8] The circumstances surrounding the taking of the birds and feathers, and Fiddler's knowledge or lack of knowledge are pertinent to the Lacey Act counts.

663 ("Federal policy since the acquisition of Alaska has been to make no treaties with Native Alaskans.") (citing COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 739 (1982)).  Furthermore, there is nothing in the legislative history or surrounding circumstances reflecting that Congress considered and overrode treaty rights.  *Accord Bresette*, 761 F.Supp. at 663-64.  In light of the absence of statutory language implicating treaty rights, the court must conclude that Congress did not abrogate Fiddler's treaty rights in enacting the MBTA.  *Id.* at 664.  Therefore, inasmuch as Fiddler enjoys a treaty right to sell the migratory bird feathers listed in Count One, and this reserved treaty right was not abrogated either expressly or implicitly by the MBTA, Fiddler's motion to dismiss should be granted.  *See Bresette*, 761 F.Supp. 658; *United States v. Cutler*, 37 F.Supp. 724, 725 (D. Idaho 1941) (dismissing MBTA charge against tribal member for shooting a wild duck).

**II. Motion to Dismiss Counts Two and Four of the Superseding Indictment (#31)**

Counts Two and Four of the Superseding Indictment charge Fiddler with violating the Lacey Act, 16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B).  Fiddler argues that the Lacey Act counts must be dismissed because the Superseding Indictment does not properly allege that he violated the Lacey Act. Pursuant to the Lacey Act, it is unlawful for any person:

> to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken possessed, transported, or sold in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law.

16 U.S.C. § 3372(a)(1).

The penalty provisions of the Lacey Act provide for a felony charge if one violates section 3372(a)(1) by "knowingly engaging in conduct that involves the sale or purchase...of fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of ... any underlying law, treaty or regulation."  16 U.S.C. § 3373(d)(1)(B).  The government may file a misdemeanor Lacey Act violation against "[a]ny person who knowingly engages in conduct prohibited by [Section 3372(a)(1)] and in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of ... any underlying law, treaty or regulation."  *Id.* at § 3373(d)(2).  "In order to violate the Lacey Act,

a person must do something to wildlife that has already been 'taken or possessed' in violation of the law." *United States v. Carpenter*, 933 F.2d 748, 750 (9th Cir. 1991). In other words, conviction under the Lacey Act requires a predicate offense. Fiddler argues that Counts Two and Four should be dismissed because (1) the superseding indictment fails to state a claim that Fiddler violated the Lacey Act; and (2) the superseding indictment is insufficient because it lacks specificity. Mot. (#31) at 3, 5.

### A. *Motion to Dismiss for Failure to State a Claim*

Fiddler argues that the Superseding Indictment fails to state a claim because the government has failed to properly allege the necessary predicate act. As explained by the government, however, the Superseding Indictment expressly alleges in Count Two that the defendant "should have known that the wildlife had been taken, possessed, transported, and sold in violation of the laws of the United States, to wit: The Bald Eagle Protection Act, and The Migratory Bird Treaty Act . . ." Similarly, Count Four alleges that Fiddler sold a war bonnet "knowing that the wildlife had been taken, possessed, and transported in violation of the laws of the United States, to wit: The Bald Eagle Protection Act, and The Migratory Bird Treaty Act." The government explains that Counts Two and Four are not predicated on the sales alleged in Counts One and Three in violation of the MBTA and BGEPA, respectively. As explained at oral argument, the "triggering offense was the prior possession and transport of protected feathers in violation of the MBTA and BGEPA." The government further argued that the evidence suggests Fiddler had obtained the feathers from other people who had hunted the birds in violation of the MBTA and/or BGEPA. Any of these prior acts – the purchase/sale, transport, or possession – of the feathers by Fiddler prior to his sale of the feathers to the undercover agents are therefore the alleged predicate offense. Whether Fiddler knew or should have known the circumstances surrounding the initial taking of the feathers are matters of fact that the government must prove at trial.[9] Fiddler's motion to dismiss for failure to state a claim under the Lacey Act should therefore be denied.

---

[9] Fiddler argues that National Policy and the Code of Federal Regulations allow Native Americans in some instances to possess, transport, and pass down animal parts otherwise regulated by the MBTA and BGEPA. Whether Fiddler did or did not have a permit pertaining to the specific feathers at issue are issues of fact that must be addressed, if at all, at trial.

**B.** ***Motion to Dismiss for Insufficiency of the Indictment***

Pursuant to Rule 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment must furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defense, to ensure that he is prosecuted on the basis of the facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge. *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).

Fiddler argues, in the main, that neither Count Two nor Count Four of the Superseding Indictment alleges facts to support any allegation that he acquired or possessed the feathers illegally or that he knew or should have known about the feathers' illegal status. Mot. (#31) at 6. Fiddler's argument ignores the fact that the government is not required to describe the evidence or plead evidentiary details in the indictment. Generally, an indictment is sufficient if it sets forth the elements of the offense charged so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged. *Hamling v. United States*, 418 U.S. 87, 117 (1974) (upholding indictment that charged defendants only in the statutory language); *U.S. v. ORS, Inc.* 997 F.2d 628, 629 (9th Cir. 1993). Moreover, it is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished. *Hamling*, 418 U.S. at 117 (citation and internal quotations omitted).

Count Two of the Superseding Indictment accuses Fiddler of selling a dance bustle, which was comprised of feathers from specific bird species and valued in excess of $350, on or about January 24, 2008 in the State and Federal District of Nevada, for money and other consideration, where in the exercise of due care he should have known that the wildlife had been taken, possessed, transported, and sold in violation of the MBTA and/or the BGEPA. Count Four accuses Fiddler of selling a war bonnet which was comprised of feathers from specific bird species and valued in excess of $350, on or about February 28, 2008, in the State and Federal District of Nevada, for money and other consideration,

10

knowing that the wildlife had been taken, possessed, transported, and sold in violation of the MBTA and/or the BGEPA. Fiddler argues that the indictment should plead facts to indicate *how* Fiddler allegedly knew or *why* he should have known that the feathers had been taken in violation of the MBTA or BGEPA. Presumably the government will provide discovery materials that will shed light on the evidence the government will offer at trial. For pleading purposes, the Superseding Indictment adequately sets forth the offenses charged and informs Fiddler of the elements of the charges he faces, the description of the items as issue, the date on which the alleged activities occurred, and that the activities allegedly occurred in Nevada. For pleading purposes, that's sufficient.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Fiddler's Motion to Dismiss Count One of the Indictment (#18) should be granted, and that Fiddler's Motion to Dismiss Counts Two and Four of the Superseding Indictment (#31) should be denied.

DATED this 11th day of March, 2011.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**